Case No. 20131168. It's an appeal from the United States District Court of International Trade. And Mr. O'Neill, I understand you only want to reserve three minutes for rebuttal? Correct, Your Honor. Okay. Good morning, Your Honors, and may it please the Court. The issue in this appeal presents a straightforward legal question of whether a bonding carrier's obligations are satisfied when it makes the required transportation, report, and delivery of in-bond merchandise to the Port Director of Customs. The red brief says at 27 that the actual consignee in this case was Intercambio, care of L.E. Forwarding and not the District Director of Customs at Port Laredo. Is that true? I do not believe so. The appropriate in-bond document, in this case Customs Form 7512, clearly lists a consignee before L.E. Forwarding. That consignee is the Port Director of Customs at Laredo. And now when you compare that document with the regulatory scheme... What's the 7512 in there? It's Joint Appendix 40 to 42, I believe, Your Honor. When you look at that document, you'll see that there is a clear indication that what is required of the in-bond carrier is delivery to the Port Director. Indeed, when you look at the language in the third line of the lower right-hand corner of that document, it's very small and somewhat difficult to read in the appendix. It says consigned to District Director of Customs, and then underneath it, it says consignee Intercambio. That's correct, but if you look at the language... So wait a minute. You told me it wasn't correct. It's not correct that C.H. Robinson, as the in-bond carrier, was obligated to deliver the merchandise to L.E. Forwarding. All that's required by the regulation is delivery to the Port Director. And what constitutes acceptable proof of proper delivery is governed by the regulation at 18.8a in the second sentence. That may be so, but the regulation that we're looking at is... We know the merchandise was missing, right? I mean, we can see that, or you agree to that. The merchandise went missing. Nobody knows where it ended up. So the question is whether the regulation extends to your client because your client was exported under a T&E license or permit, and under that permit, whether missing merchandise falls under your liability. So it's not actually delivery. I don't think that's the issue here. It's whether the merchandise was missing or not, and if it was, then who's liable for it. If you look, though, Your Honor, at the language of 18.8c, there's reference to missing merchandise, and then there's reference to a causation element. The causation relates to whether or not the carrier's failure to transport, report, and deliver the merchandise caused the merchandise to go missing. In this case, there were three entries. We have three properly received stamped copies of the en bon document. This document, according to the regulations, constitutes proper delivery under the regulatory scheme. Now... Should we interpret that... I mean, even if the regulatory scheme appears to support your argument to some extent on space, do we need to interpret the application of this regulatory scheme in light of the actual facts and how the process worked? There was no court director, right? Certainly there was. Didn't they use the honor system down there in Laredo? In response to that, I would direct Your Honor to the regulations at 18.7b that indicate that it's within the court director's responsibility to set out the procedures to satisfy him that the merchandise that's supposed to be laden for exportation is, in fact, laden on that export and conveyance. So it doesn't actually have to be exported. All you have to do is walk in and get a stamp. Correct. Do you really believe that? I do. The regulations indicate that it's incumbent on the court director to set forth procedures to reasonably satisfy him that the merchandise is going to be exported. That's okay for your client to just cheat. Is that right? As long as they get a stamp, they don't have to do anything. They're not responsible for exporting. If the court director set forth a system for exportation that was reliant on an honor system or did not properly secure the merchandise for exportation or chose not to search the particular containers in this case, I would say that the court director is bound by those procedures and that it does not change the terms of the bond that governs the performance that's required by my client. Those bond covenants are contractual and they bind my client to perform certain duties. In this case, the duty was to deliver to the court director of Customs at Laredo. Are you saying that the regulations simply didn't contemplate a circumstance in which the court director would allow the honor system to apply? Correct. There was evidence in the trial that after the relevant times in question, the court director of Laredo, Texas changed the exportation procedures so as to further secure the exportation of in-bond merchandise. With respect to your argument as it relates to the question of what constitutes acceptable proof of delivery, acceptable proof of delivery doesn't necessarily state that it's conclusive proof of delivery, does it? Exactly, Your Honor. Do you think it does or it doesn't? No, this proof can be rebutted by showing from the government that there was a failure to perform one or more of the three actions that are required in 18.8c. That's transportation, report, and delivery. Without evidence tending to suggest that there was a failure in one of those three actions, I would submit that there is no possibility that my client failed in its obligation. When the government asked about whether these goods were exported, your client's response was to provide certain Mexican government documents showing internal border control stations within Mexico. I think they're called pedimentos. Pedimentos, yes. Had issued these documents, and your client forwarded those to the United States government. That's correct, right? There was actually an event that occurred prior to that. My client first submitted the stamped copies of the in-bond documents as proof that its obligations as the delivering carrier had been met. Now, the lower court made an error in its identification of the carriers that are involved in a T&E entry. There's a delivering carrier and there's an exporting carrier. As we addressed at the beginning, that exporting carrier was LE40. That was an unbonded carrier. Now, as I just described, 18.7B puts the requirement on the port director to set forth procedures that will satisfy him that merchandise is laden for exportation. When you look at the other... It says he can even require supervision over the goods. There's a wide latitude of options provided for the port director  But when you look at 18.7A, you'll notice that there is a clear reference made to a delivering carrier. In 18.7C, twice reference is made to an exporting carrier. In 18.7C is what requires the exporting... Is your client the delivering carrier under 18.7A? Correct. So doesn't that impose certain record requirements? Outside of what the port director says you're to do, 18.7A says that promptly no more than two days after the arrival of any portion of the in-bond shipment of port exportation, the delivering carrier shall surrender the in-bond manifest. And then it goes on to the port director as notice of arrival. Did you do that? Yes, Your Honor. You surrendered an in-bond manifest? That is the Customs Form 7512 that we had three covering three different entries. And each of these entry documents, the 7512, were properly received with the customs stamp. How was that surrender made to the port director? Well, in this case, it was made through the broker at the port of exportation. Okay, so you had those stamped, but I'm asking whether two days after that, after that stamping, was there a surrender of the in-bond manifest to the port director? I'm not exactly sure the time frame of when the in-bond manifest was surrendered, but the government's complaint- Do you have any evidence that it was ever surrendered by your client? Yes, Customs had a copy of these stamped in-bond documents. That was never an issue at trial. The only issue at trial was whether my client violated 18.8C. Did your client surrender those manifests to Customs? Yes, it did. When? After the delivery of the merchandise to the port director. Show me in the record where there's evidence of that occurring. Of the surrender of the in-bond manifest? I'm not exactly sure where in the record that was indicated, Your Honor. Because we're also dealing with the pedimientos and other documents that came up afterwards, after Customs initiated the investigation. But I'd like for you to, if possible, show me where that's in the record. Let me ask you another question, then. Your client contracted with Mario Transport to actually carry the goods. Correct. So you didn't carry the goods, Mario Transport did. Correct. At the time that all this occurred, it appears to me that Mario Transport had authority to take goods into Mexico. I don't believe that's the case. There was testimony from Mr. Munoz, an employee of C.H. Robinson, that indicated that at the relevant times in question, U.S. carriers could not enter Mexico. Now, there were government witnesses that testified to the contrary, but I think the court can take... U.S. carriers at that time were not permitted to carry goods into Mexico directly over the border under the NAFTA, under the appendices that deals with these issues. However, there's an arrangement with Mexico at the time that allows some carriers to transport directly into Mexico, isn't there? What's important here, Your Honor, though, is that the in-bond... Answer my question. Answer my question. Mario Transport, there's evidence in the record that indicates that Mario Transport had authority to take goods directly into Mexico. I'm not sure that there was, Your Honor. What I would say, though, is that the in-bond contract in this case... Let's look at 275 of the appendix, page 276. And this is an email from Donald Munoz to Gordon Anderson, and they're talking about what we need to do to get out of this bind we're in. And on page 276, at the first full paragraph on the bottom, it says, so I have some questions for you to try to put this puzzle together. First, it sounds like this was not a transload. And a transload is when you take a shipment up to the border, unload it, and somebody else... Yes. And they said this is not a transload. It says, though it was a shipment, as they were inbound, would have had to been delivered to a bonded container freight station in Laredo. This did not happen. Or if this did happen, we should be able to go to the CFs and get necessary receipts showing that they were received and should get us off the hook. It goes on, as after the goods had been transferred, someone else's truck to move across the border, an IE bond would have had to have been prepared to move the border and transfer liability to somebody else. Then the answer to that is on the 275, close to the bottom, it says also to your question below, no, these were not transloads. We had one carrier in specific that did all the loads for us, that's Mario, because they allowed their trailers to go into Mexico. But there's a distinction to be made between the trailer and the engine. The engine that would be taking these goods into Mexico is different from the engine that was taking the goods from the Port of L.A. to the Port of Laredo. Now that's another way to take the goods into Mexico, but Mario, at least as far as everyone understood at the time, had the authority to take these goods straight into Mexico. If that is the case, as these emails that you've read seem to indicate, what's important though is that in this case, there was no requirement that Mario's trucking take the goods into Mexico. The company that was obligated to do that was L.E. Fording. Well, I guess that's my point. Your client contracted with a carrier that at that time was one of the few carriers that could take goods into Mexico. It was not a transload, meaning you were not going to unload the goods at the export lot at the border. But my client did not set up the shipment. That was the importer, TransUnion. Wait a minute. So your client just shows up at these 7259s that were date sent, but that's it. You have no other information. There's nothing else. No receipts, no manifest, there's no bills of lading. There's nothing else there. My client was hired by the nominal importer of record, TransUnion Group, to take the goods from one location in the United States to another location in the United States. From there, L.E. Fording was obligated as the exporting carrier to take the goods. But that's not all that happened. You're a bonded carrier, and this is a T&E transport permit that you're operating under. Correct. And the E stands for export. Correct. But the regulatory scheme envisions that there are two different carriers, a delivering carrier and an exporting carrier. So the bond really only governs transportation with the United States and doesn't have anything to do with export. Is that correct? Exactly. So why is it called T&E? Because, as I said, the regulatory scheme envisions that there's two carriers involved in the transportation, which would be the delivering carrier, and then the exportation, which is the exporting carrier. I hope you don't charge too much for that bond then. Counselor, if you have contracted, you have a T&E license, and you contracted with a carrier that can actually carry the goods into Mexico, doesn't that make you the exporting carrier as well? No, Your Honor, because the importer of record only hired us to take the goods from L.A. to Laredo. Had we done anything beyond the port of Laredo, had we taken the goods into Mexico, we would have been essentially stealing the merchandise because our manifest would not have provided the authority to take the goods into Mexico. I see my time is up. We'll restore your three minutes of rebuttal. Thank you. May it please the Court. We're here today because C.H. Robinson, the licensed bonded carrier that took possession of a merchandise pursuant to a transportation and exportation entry, appears not to know what happened to the merchandise that it took possession of. Well, isn't that partially because the government just decided not to have a port director? No, there actually, I mean, there was a port director.  We didn't hang out actually at the port though. The procedure at the port of exit was that at the time you would arrive the merchandise by receiving a stamp at an unmonitored stamp machine. That would take care of responsibilities you had for initially arriving the merchandise. However, that stamp was always subject to subsequent audit by customs to determine if indeed the merchandise had been properly disposed of. But that's the practice. But the regulatory scheme says you submit those documents, you deliver them to the port director, and that's the end of your obligation as the inbound carrier, as a mobile carrier. That's incorrect, Your Honor. Let's go to the statutory scheme. Let's look at the regs. It says that your obligation, and Judge Rayna pointed out some of it before, but the obligation is to deliver to the port of destination or exportation the bonded merchandise. Then acceptable proof of delivery of bonded merchandise is a properly received copy of the inbound document. And you agree that that's what the 7512 is, right? Yes. Okay. Well, the 7512 can be. But, I mean, first, a properly received copy at the port of Laredo at the time was one that had been stamped and was subject to confirmation. But where does it say in the regulations that this is proof of your delivery and this is all you have to do, but we might go back later and check it? The fact that you did that doesn't mean that the regulations contemplate that. It contemplates it in 18.7. The statute, the very statute requires all carriers, and this is, I believe, pursuant to 1508, has a record-keeping requirement on all carriers because the statute itself envisions that a bonded carrier will be responsible for providing and ultimately accounting for merchandise, especially where it is subject to a transportation-exportation regulation. But you didn't allege that they didn't keep records. No, we allege that they, well, the records are what told us what would have happened to this merchandise, which they said it was exported. Here's a false pedimento that shows it was exported and we met all of our obligations. Well, the pedimentos, which we demonstrated. But you admit that the regulations contemplate that there are two different carriers. Sometimes they could be one and the same, but there are two different sets of obligations under the regulations. The regulations account for the possibility that it will be sent to another carrier, but pursuant to 18.3e, if that other carrier is, as they acknowledge here today, a otherwise unlicensed, unbonded carrier, the original carrier remained responsible for the movement. So if they forwarded, and let's also note, at trial they never alleged that the merchandise had been provided to LE Forwarding. They alleged that it had been provided to Mariopena. They alleged that Customs had taken actual physical possession of the merchandise. They alleged that it was exported, but they never came in and alleged that LE Forwarding had taken possession of the merchandise. And that makes sense, because again, pursuant to 18.3e, they would have remained responsible for the merchandise if LE Forwarding had taken possession of it. Is it your view that Robinson is the exporting carrier? Yes. Because they were the bonded carrier that was ultimately responsible for the movement and on the 7512s, it specifically provides them as the bonded carrier. Now, the regulations relating to that... Let me explain how I understand how 18.8 operates. 18.8 speaks to the delivery of merchandise and the proof of the delivery. You know, you show up, truck's here, middle of the night, the U.S. Customs agent goes out and they stamp the documents, the 7512s. Then you go down to C, and there's penalties if you don't do that. That's B. Yes. You don't show up and you don't show that you showed up. Yeah, that's correct. That's a show-up regulation. B is the penalties for failure to show up, and C is the penalties for missing merchandise. So there's more to it than just showing up. You've got to show up with the goods. Yes, and although we would... Is that correct? Yes, and although we would also... You're responsible for getting... And this takes several steps through the regulations, but pursuant to 18.20A, which is the transportation-exportation regulations, when goods are entered into the United States pursuant to transportation-exportation entry, you're required to have a carrier to take those goods, and that movement is governed by other transportation regulations, specifically it cites to 18.11B. 18.11B provides the carrier has to take it to the port of destination. Well, in transportation-exportation, the port of destination is Mexico. In fact, you can look on the 75.12s. It says that the final foreign destination, Mexico. The next line below that provides for the consignee at the customs port of exit or destination. Doesn't the carrier have an obligation when it delivers the goods within a certain amount of time to also notify customs that the merchandise has not been entered? Yes, I mean, there are multiple requirements on carry. There's delivery. I believe it's a 20-day requirement that after the merchandise is initially delivered, you need to notify customs that have disposed of the merchandise. That's 19 CFR 4.37B. I mean, there are overlapping obligations here. So if it's not been entered, of necessity, it's been exported. Is that not correct? That would be the conclusion, although we, again, allowed C.H. Robbins to otherwise demonstrate what happened to the merchandise. They had alleged it was exported. I mean, the focus of this case is on exportation. What's a carrier supposed to do? They show up at an empty port. I mean, there's nobody there. There's nobody supervising. There's nobody to report to. And they are told that all you have to do is stamp this document, we're going to use the honor system, and you leave it. And that assumes that you have satisfied your responsibility, at least with respect to the customs forms that are identified in the regulation. So, I mean, and now you're saying they have to stand around and wait and hope that maybe someday this guy's actually going to show up to his post and that then they can do some inspection while they're there, and they have to sit and wait until the actual exportation occurs? Well, the simple fact, if it's still in the port, the customs can inspect the merchandise. So, I mean, you can export the merchandise, but when you export the merchandise, you need to make certain you have some documentation of that. It doesn't have to be a pediment. Let me interrupt you for a second. They have to sit around and wait until the other truck takes the goods. Well, if that's what they're doing. If they're not directly shipping it in, they could have it go to another yard and effectively transfer trucks or transfer trailers. They have to have the transfer occur. They don't just walk in and stamp the paper and drop the goods in the yard, do they? And in this case, we do know there's a disconnect between the people, the individual who received and stamped the 7512s never saw the merchandise. He simply received the document, took it to the export lot, stamped the document, never saw the trailer, never received the trailer. Why is your customs agent then responsible for this? In what sense? Well, I mean, he's a U.S.-bonded customs agent. He's licensed by customs to conduct official customs transactions. And he conducted this transaction. He's the one that acknowledged that the goods arrived. Why don't you have him on the hook? Well, there isn't a person who's acknowledging the goods arrived. It's, again, an unmonitored stamp machine. Well, it's a customs agent. There's testimony. The customs agent says that he's the one that stamped the documents. And then he says, but I never saw the goods. I never understood. I don't know what happened to them. Respectfully, I'm not aware of any customs agents. There's no other court in the country that's run in this sloppy method, is there? Well, pre-2001, this was actually not an entirely uncommon procedure. Since 2001 customs, we do acknowledge this changes procedure. Steven fixed it at Laredo, right? Including at Laredo. There are different procedures. In fact, all ports of entry going into Mexico, Tijuana, El Paso, Juarez, and then you go down past down past North Laredo, they were the official ports of entries. All other ports of entries, or whichever many, operated in this fashion. And part of that is, prior to 2001, pursuant to the Mott Act, customs believed, given the system of shared responsibility, it was sufficient to use such a system to document the movement of goods. Subsequent to 2001, customs decided that the system needs to be improved. Partly because they read the regulations and realized that if they do that, then there's a whole gap in responsibility, right? No, no. I would say that's simply to ensure that merchandise is being properly exported. There was a problem, not with enforcement, but with ultimately in-bond diversions. So customs moved to a system of supervised exportation to prevent in-bond diversions such as occurred in this case. So, and this question goes to the sufficiency of the evidence that Judge Gordon looked at. Because he had to find, we can, we're reviewing his decision on whether there's a preponderance of the evidence. That's what we're looking at. And it seems rather convenient that the decision was that the merchandise was missing and never exported. And it seems to me that if it's exported, if the evidence shows that the goods were exported, meaning they made their way into Mexico, legally or illegally, that were exported out of the U.S. Customs Territory, then it seems that you have a huge problem. And when I look at the time, I believe that there was a dumping duty order on these goods at about 450%, which made it cost prohibitive to take these goods from China directly into Mexico, say to the Monsonio Port. And that's point one. And point two is that if you're going to steal these goods in the United States, why do it this way? I mean, why try to show off that you got impedimientos and you have a stamp 72-15? Doesn't that evidence point to something else? That the goods went into Mexico under a fraudulent customs oversight or, you know, 2001? The Mexican Customs was still known to allow these type of shipments to occur. Your Honor, all of that was discussed at the trial court, was rebutted by the trial, was rebutted by our expert, who was the Commissioner for Post-Exportation, in charge of these sort of movements. And, I mean, ultimately, the answer is we looked at the impedimentos, the false impedimentos. We acknowledge that there are ways that these goods were... Judge Gordon based his decision that the goods were missing on the falsified impedimentos. And these are falsified Mexican documents, correct? That's correct. But, I mean, falsified Mexican documents, in my mind, I can see the whole transaction happening. The arrival of the goods, crossing the border, you got the impedimentos, you show U.S. Customs papers, now you have impedimentos in the hand, the goods are in. And that's exactly what could not have happened and that our expert testified. Because our expert provided with these type of false impedimentos, you would have not gotten driven to Mexico. He was never asked, though. He was asked. Yes, he was never asked, do goods ever enter Mexico through the use of false impedimentos? That's incorrect. He was and he did testify and he testified. No, he testified how you would generally get goods into Mexico using false impedimentos. It was a different type of false impedimento. It was a impedimento in which you would do something. These goods were diverted into commerce in Mexico. Wearing apparel could be brought into Mexico illegally. The way you would do that typically would be you would change the, you would ultimately change the country of origin. There were a whole series of sophisticated smuggling methods that went to bring goods into Mexico. The problem is these particular pedimentos wouldn't get you across the border. It's also notable that they didn't, weren't produced, they weren't produced by Mexico. They weren't produced from anyone in Mexico. They were produced when customers inquired what happened. Remind me what the country of origin was on the pedimentos. The origin? The country of origin. They were all generally, it depends on the actual entry, but I believe the court characterized them as generally Chinese wearing apparel. So they were goods coming in from China. They were subject to high quotas in the United States. They were subject to high quotas in Mexico. So these were goods that were a problem both for the United States and for Mexico. Ultimately, the pedimentos at issue in this case were not the kind of pedimentos our expert concluded. There was no testimony to the contrary that with these pedimentos the goods could not and would not have entered Mexico. Okay, I have only one other question. Why do you say that St. Robinson was the exporting carrier? What's the basis for that? Well, because they took responsibility for it on the 7512s. They're the only carrier listed. And again, pursuant to 18.3e, if anyone else was actually physically exporting these goods, C.H. Robinson still would have remained responsible for that merchandise. So it still would remain the exporting carrier. And even if it's not the exporting carrier, I know they use that to say, well, the record-keeping requirements don't apply to us. Well, there's a general record-keeping requirement under 1508, the statute itself, that requires all carriers to keep these kinds of records. Okay, your time is up. Any last words? Thank you. For these reasons and the reasons set forth in our brief, we respect the request that the Court affirm the decision of the Court of International Trade. Thank you, Your Honor. All right, three minutes. I'd like to address a few points very briefly. First of all, in the lower right-hand corner of the 7512, you'll notice language that says, delivery into the custody of the customs officers at the port named above. That right there, regardless of whether or not customs saw or took possession physically of the merchandise, walked over to the container and clocked it in, right? This tells you that by getting the stamp on the 7512, there is a shift in legal custody from the carrier to customs. Now, second, evidence of non-exportation is not evidence of non-delivery. If we are the delivering carrier, anything tending to show that the goods were not exported does not serve as proof that we failed in our obligations to deliver. If I'm a train conductor... Let me ask you a question, so it seems to me that this is fairly routine where you have this type of check-off that delivery has been made to a particular port of entry or a customs checkpoint. But that doesn't answer the question whether all the goods are there. You may... This document may say there's 1,500 cartons of men and women's jogging clothes, when in fact there's only 1,000, and 200 of them are missing. Precisely. So isn't it the case then that under 18.6C... I think it's 18.6... 18.8C, that provides a penalty for carriers like your client where at the end of the day, say, it's discovered, for whatever reason, that 200 cartons were missing. I believe the language you used in asking a question to Mr. Maggard was that they have an obligation to show up with the goods, and that's precisely correct. That's the obligation. But let's say two days later, it turns out that you showed up with the goods, but not all of them. Exactly. You're missing. They open up the container and look inside, and they go, wow, there's 200 cartons missing here. Right. Aren't you obligated then under 18.8C to pay the duties on missing merchandise? No, we're not. And to support my answer, I would direct you to the third sentence of 18.8A, which says, when sealing is waived, any loss found to exist at the port of exportation is presumed to have occurred while in the custody of the bonded carrier. Now, the lower court cited this in support of its presumption against C.H. Robinson, but it failed to include the first few words of that last sentence. It did not say when sealing is waived. It just said that there's a presumption against the bonded carrier, and that alone is reversible legal error. And sealing was not waived. Sealing was not waived. On the 7512, there's an indication in the lower left-hand corner that these containers were labeled, and then on the driver hand tags, which are in the appendix at 353 and 354, there are seal numbers provided for these containers. So sealing was not waived, and only when sealing is waived is there a presumption against the bonded carrier. And the 7512 declares at the bottom that as of delivery, the goods were in order, in proper order. Exactly. Exactly. If I may, very briefly, I was about to launch into a hypothetical. If I'm a train conductor licensed to take a train from point A to point B, and there's a second train conductor licensed to take the train from point B to point C, any evidence tending to show that the train never arrived at point C would not inform a finding that I failed in my obligations to take the train from point A to point B. And for these reasons and the reasons discussed in our brief, we would respectfully request that the lower court's decision be reversed and to remain in favor of C.H. Robinson. Excuse me. Judge Wallach wants to hear from the government for another 30 seconds. About sealing. But I will give you the last word. Okay. Thank you. All right. Your Honor, pursuant to the regulations, and I believe that I think he just had one question. This is not another... It's about sealing being waived. In this case, they're incorrect. The goods were labeled not sealed. You can find that in the lower left-hand corner of the 7512s. There's a choice under the regulations. I believe it's 18.3.        in the record, I believe it's 18.3. I believe it's 18.3. I believe it's 18.3. I believe it's 18.3. I believe it's 18.3. There's a box where you indicate whether there are sealed numbers, if it's sealed, or, in the alternative, if it's waived, if it's labeled. What exactly has happened to the goods? In the lower left-hand corner of the 7512s... What page in the appendix? This would be 40-42.  What page in the lower right-hand corner of each page? Now what page in the lower right-hand corner of each page? You can choose any of them. They're the same on any of these articles. Where does it say waiver? It doesn't say waiver. It says labeled. Okay. Labeling under the regulations is distinct from sealing. Okay. Labeling is... We got your answer. ...under G. And finally, Your Honor, I mean, this argument was raised in the Rupp Library for the first time. It was never raised before the trial court, so... Thank you. Any last word on that? Just very briefly, Your Honor. Both the 7512 and the driver hand tags indicate that these containers were sealed. Whether this was raised at the trial court is immaterial because in the court's opinion, it misstated the third sentence in 18.7 or in 18.8. Is labeled the same as sealed or different than sealed? It is the same as sealed. There is no... Is an in-bond carrier that's transiting goods through the United States, are they required to carry the goods under seal? They're not. 18.4 of the regulations indicates that under certain circumstances, the court director can waive sealing. Those circumstances aren't present here, and there's no evidence deduced at trial that suggests that it was. Indeed, the bond contract indicates that these were labeled, and then the driver hand tag provides sealed numbers for each container. And what were the sealed numbers? Because it says labeled rather than sealed numbers. In the appendix on the last two pages, I believe, there are the driver hand tags that I'm speaking of, and it lists... It lists, just above the darkened table right there, original seal number, and for Joint Appendix 353, W159801. That, to me, is a clear indication that these containers were sealed, and without evidence to rebut that these containers were sealed, it was an error for the court to presume liability against the bonded carrier. Okay. Your time is up. Thank you. This case will be submitted as well.